[Cite as *In re N.C.*, 2012-Ohio-1641.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 97155**

# IN RE: N.C.
# A Minor Child
# [Appeal by Mother]

## JUDGMENT:
## REVERSED AND REMANDED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD 10921764

**BEFORE:** Jones, J., Boyle, P.J., and E. Gallagher, J.

**RELEASED AND JOURNALIZED:** April 12, 2012

**ATTORNEYS FOR APPELLANT**

Joseph E. Feighan, III
14516 Detroit Avenue
Lakewood, Ohio 44107

Michael B. Telep
4438 Pearl Road
Cleveland, Ohio 44109


**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor

BY: Pamela Hawkins
Assistant Prosecuting Attorney
C.C.D.C.F.S.
4261 Fulton Parkway
Cleveland, Ohio 44144


**FOR FATHER**

C.H., Pro se
16410 Huntmere Avenue
Cleveland, Ohio 44110

LARRY A. JONES, SR., J.:

{¶1} Mother-appellant appeals the trial court's judgment in which it (1) overruled her objections to the magistrate's decision to grant legal custody of N.C. to Father, (2) terminated its previous order committing N.C. to the temporary custody of the Cuyahoga County Department of Children and Family Services ("CCDCFS" or the "Agency"), (3) affirmed, approved, and adopted the magistrate's decision, and (4) granted legal custody of N.C. to Father. We reverse and remand.

I.   Procedural History and Facts

{¶2} In November 2010, CCDCFS filed a complaint alleging N.C. to be an abused and neglected child. A magistrate was assigned to the case. An adjudicatory hearing was held in February 2011 and, at its conclusion, the magistrate adjudicated the child to be abused. Mother objected to the adjudication, but the trial court found the objections not well taken, overruled them, and affirmed, approved, and adopted the magistrate's decision.

{¶3} The Agency filed a motion to amend the dispositional prayer from temporary custody to legal custody. A dispositional hearing was held in May 2011. Mother and Father, each with counsel, along with the Agency's attorney, the assigned social worker, and N.C.'s guardian ad litem ("GAL") were present. The following facts were elicited from Mother and the social worker.

{¶4} N.C. was born in November 2006, and up until November 2010, she had been cared for by Mother without any involvement from Father. In November 2010, N.C.,

then four years old, was found alone in the hallway of the apartment building where she resided with Mother. Mother had secured the services of a babysitter who abandoned her charge. Mother was contacted, returned home, and was taken into police custody, where she was charged with child endangering. The Agency filed a complaint and was granted temporary custody of N.C.

{¶5} Father became tangentially involved in the child's life in 2010 as a result of Mother filing for child support. The Cuyahoga County Support Enforcement Agency ("CSEA") located Father and established his paternity. When Mother was charged with child endangering, CCDCFS investigated Father's ability to provide for N.C., found him suitable, and placed N.C. with him.

{¶6} According to the social worker, Father lived with his mother in a three-bedroom house, which the social worker described as "appropriate." Father was working part-time as a security guard six hours a week, and had recently taken the Cleveland Police Department test. Father's mother worked full-time, and along with Father's cousin, aided in the care of N.C. The social worker testified that he did not investigate if Father had been meeting his child support obligations. The record demonstrates that, in fact, Father had not and was $4,000 in arrears.

{¶7} The social worker testified that N.C. was bonded to Mother and Father and wanted to live with both of them. Father expressed to the social worker that it was his desire to have Mother continue to be involved in N.C.'s life and that he would facilitate that relationship.

{¶8} In regard to Mother, the social worker testified that her case plan consisted of her completing parenting classes and getting a psychological evaluation. Mother completed the parenting classes. The social worker testified that notwithstanding Mother's completion of parenting classes, he was concerned about her ability to parent. His concern was based on a single incident during Mother's visitation with N.C. Specifically, through agreement of the parties and counsel, Mother's visitation with N.C. was to take place at her mother's house, with maternal grandmother present. During one of the social worker's visits with N.C., N.C. told the social worker that she had been to Mother's house, Mother had a man over, and she saw the man come out of Mother's bedroom, naked and with a "tail."

{¶9} Mother did appear for the psychological evaluation in-take interview but the social worker testified that the psychological evaluation was not completed because of a "mix-up" he had with the agency that was to do the testing. He further testified that after N.C. was found alone, Mother's landlord evicted her. The social worker had attempted three times to visit Mother's new residence, but was unsuccessful. The first scheduled visit they "missed each other"; the second scheduled visit the social worker had an emergency but did not notify Mother; and the third scheduled visit he went to Mother's residence, but she did not answer the door. The social worker was of the opinion that Father should be granted legal custody of N.C.

{¶10} Mother testified that, relative to the underlying child endangering charge, she had left N.C. with a babysitter, but admitted that she did not exercise the best

judgment in selecting the babysitter. Mother was placed in the Selective Intervention Program (SIP), which if she successfully completed, would result in the child endangering charge being dismissed.

{¶11} Mother testified that parenting classes had helped her learn about making "life decisions" and that she would implement what she had learned in parenting N.C. She was employed at the Cleveland Clinic as a medical assistant, and had been for the past seven years.

{¶12} In regard to the visitation issue, Mother testified that she "misunderstood" the arrangement and thought that it was acceptable for N.C. to visit her house if maternal grandmother brought her and remained there. According to Mother, maternal grandmother was present the entire time of the visitation at her house. She testified that she brought N.C. to her house because she wanted her to see her bedroom and get toys to take to maternal grandmother's house. Mother denied that a man was there.

{¶13} Mother also testified about a prior child endangering allegation which resulted from another allegation that she had left N.C. home alone. According to Mother, she was home, but asleep. The social worker testified that the allegation was dismissed as unsubstantiated.

{¶14} At the time of the hearing in May 2011, N.C. had been living with Father for the preceding six months. The May hearing continued in June, at which time, the magistrate heard closing arguments, the GAL's recommendation, and issued her ruling. The GAL testified that he stood by his final report, which had been filed with the court in

January 2011, and in which he recommended that: (1) it was in N.C.'s best interest that she be returned to Mother, with "perhaps" protective supervision by the Agency; and (2) N.C. should have "liberal" visitation with Father.

{¶15} The magistrate stated that she "felt strongly that, although mother did make some terrible errors[,] * * * she has learned from them * * *." The magistrate questioned the GAL about how the child was doing with Father. The GAL responded: "The child gets along with the father. I'm still questioning the living arrangements of the father, whether he's there with the child. On the same floor as the child. And I don't know the answer to that question."

{¶16} The magistrate asked the GAL if he had been to the house lately, to which the GAL answered, "[n]ot lately." The magistrate responded, "[b]ecause it is June not December and I really would have preferred a report that was more current. At this point in time I am going to grant legal custody to the father. I want a visitation plan before you leave today."

{¶17} In her written decision, the magistrate found that the Agency

made reasonable efforts to prevent the removal of the child, to eliminate the continued removal of the child from [her] home, or to make it possible for the child to return home. Relevant services provided to the family and the reasons those services were not successful: Mother was referred for parenting and a psychological assessment. The results of the assessment are not available.

The juvenile court made the same findings in overruling Mother's objections and adopting the magistrate's decision.

{¶18} Mother filed objections to the magistrate's decision. The trial court (1) overruled Mother's objections to the magistrate's decision to grant legal custody of N.C. to Father, (2) terminated its previous order committing N.C. to the temporary custody of the Agency, (3) affirmed, approved, and adopted the magistrate's decision, and (4) granted legal custody of N.C. to Father.

{¶19} Mother raises the following assignments of error for our review:

[I.] The award of legal custody to the Father was against the manifest weight of the evidence.

[II.] The court abused its discretion when it awarded legal custody to the Father contrary to the guardian ad litem's recommendation, the manifest weight of the evidence and the court's own stated impression that Mother had learned from her mistakes.

[III.] Awarding legal custody to the Father was contrary [to] the best interest of the child.

{¶20} The assignments of error are interrelated and we will consider them together.

## II. Law and Analysis

{¶21} Under R.C. 2151.353(A)(3), after a child has been adjudicated abused, neglected, or dependent, the juvenile court may award legal custody:

to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child or is identified as a proposed legal custodian in a complaint or motion filed prior to the dispositional hearing by any party to the proceedings. A person identified in a complaint or motion filed by a party to the proceedings as a proposed

legal custodian shall be awarded legal custody of the child *only if the person identified signs a statement of understanding for legal custody * * *.*
 (Emphasis added.)

**{¶22}** The required statement of understanding must contain at least four enumerated affirmations, one of which is "[t]hat the person understands that the person must be present in court for the dispositional hearing in order to affirm the person's intention to become legal custodian, to affirm that the person understands the effect of the custodianship before the court, and to answer any questions that the court or any parties to the case may have." R.C. 2151.353(A)(3)(d).

**{¶23}** Legal custody differs from termination of parental rights. With the latter, despite losing legal custody of a child, the parents of the child retain residual parental rights, privileges, and responsibilities. R.C. 2151.353(A)(3)(c). Because a legal custody determination is not as severe as a termination of parental rights, we apply the less restrictive "preponderance of the evidence" standard of appellate review, as opposed to the "clear and convincing evidence" standard to the court's factual findings. *In re S.E.*, 8th Dist. No. 96031, 2011-Ohio-2042, ¶ 14, citing *In re Nice*, 141 Ohio App.3d 445, 455, 2001-Ohio-3214, 751 N.E.2d 552 (7th Dist.). However, when considering the trial court's ultimate decision on whether the facts as determined would make it in the child's best interests to be placed in legal custody, we apply the abuse of discretion standard. *In re B.H.*, 8th Dist. No. 95794, 2011-Ohio-1967, ¶ 10.

**{¶24}** With the above in mind, we consider the trial court's decision granting Father legal custody of N.C. Initially, we note that the Agency's request that Father be

awarded legal custody of N.C. did not comply with the statutory mandates. Specifically, Father never signed a statement of understanding. Further, although he was present at the dispositional hearing, he was never questioned by counsel or the magistrate. The record is therefore lacking any evidence from Father that he met the requirements under R.C. 2151.353. For this reason alone, the judgment granting Father legal custody was an abuse of discretion.[1]

{¶25} But we also consider Mother's contention that the evidence before the court consisted of an incomplete investigation by the social worker, a social worker who was biased for Father, as compared to her "sufficient, detailed, uncontroverted and therefore credible" testimony. We agree with Mother that the investigation was lacking. For example, at the time of the final disposition hearing in May when evidence was introduced, Mother had not completed a psychological evaluation, through no fault of her. Further, at the final disposition hearing in June when the magistrate heard closing arguments and rendered her decision, the results of Mother's psychological evaluation were "pending." Mother's case plan required her to do two things: (1) attend parenting classes and (2) submit to a psychological evaluation. She attended the parenting classes, and by the magistrate's observation, "although, mother did make some terrible errors[,] *

---

[1]At oral argument, the Agency's attorney stated that the Agency does not require parents to sign a statement of understanding; rather, it only requires non-parents who are seeking custody to sign. But this court has held that in custody proceedings parents are required to sign statements of understanding. *In re A.G. & D.A.*, 8th Dist. Nos. 94117 and 94118, 2010-Ohio-2230, ¶ 14 ("Finally, under R.C. 2151.353(A)(3), a court may award legal custody of a neglected child to either parent, who, prior to the dispositional hearing, files a motion for legal custody, 'only' if the parent 'signs a statement of understanding' * * *.").

* * she has learned from them * * *." Through no fault of her own, the evaluation was not completed at the time the court considered the Agency's request that Father be granted legal custody of N.C.

{¶26} Neither the magistrate nor the trial court gave explanations that comported with the evidence as to why it was in the child's best interest that Father be granted legal custody. Further, Father was not questioned by counsel or the magistrate as to his understanding of and ability to assume legal custody of N.C.

{¶27} We are mindful that trial courts have broad discretion in custody proceedings, but here the trial court granted legal custody of the child in favor of Father who, for the child's four-year life span, had not been involved, and did not become involved in her life on his own accord. This decision was made — without following statutory mandates and without the benefit of full investigation, which was, at least, not entirely Mother's fault — to Mother's detriment who, for N.C.'s four-year life span, had cared for her without major incident. On this record, the trial court abused its discretion in granting legal custody to Father.

{¶28} In so finding, we quote the Ohio Supreme Court's reasoning behind reasonable efforts to preserve and reunify existing families:

The right to parent one's children is a fundamental right. *Troxel v. Granville* (2000), 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49; *In re Hayes* (1997), 79 Ohio St.3d 46, 48, 679 N.E.2d 680. However, [the] government has broad authority to intervene to protect children from abuse

and neglect. R.C. 2151.01. When the state intervenes to protect a child's health or safety, "[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed are called 'reasonable efforts.'" Will L. Crossley, Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Protection Legislation (2003), 12 B.U.Pub.Int.L.J. 259, 260.

No one section of the Revised Code addresses the concept of reasonable efforts. Overall, Ohio's child-welfare laws are designed to care for and protect children, "whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety." R.C. 2151.01(A). To that end, various sections of the Revised Code refer to the agency's duty to make reasonable efforts to preserve or reunify the family unit. *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 28-29.

**{¶29}** This case lacked reasonable efforts to reunify the child with Mother.

### III. Conclusion

**{¶30}** In light of the above, Mother's three assignments of error are well taken. The trial court's judgment is reversed and the case is remanded for further proceedings that should follow statutory mandates, consider Mother's psychological evaluation, and complete the investigation into both Mother and Father's living arrangements.

**{¶31}** Reversed and remanded.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


LARRY A. JONES, SR., JUDGE

MARY J. BOYLE, P.J., and
EILEEN A. GALLAGHER, J., CONCUR